Sorry, Your Honor. The United States Court of Appeals is now in session. Okay, this is the time set for the oral argument on the government's emergency motion under Circuit Rule 27-3 for a stay pending appeal. And the time by which you've requested that we roll is March 26. So, Government Counsel, you may proceed. Thank you, Your Honor, and may it please the Court. Sean Janda for the government. I'll endeavor to reserve three minutes of my time for rebuttal. So I think it might be helpful to start by walking through some areas on both the facts and the law, on which I don't think there's any meaningful dispute between us and the plaintiffs. And so starting with the facts, first, I don't think there's any dispute that the department has really engaged in substantial efforts in this case to get relief out to the many, many class members who are entitled to that relief. Over the last three years, the department has sent out $12 billion in relief to nearly 300,000 borrowers in sort of the first two tranches of the settlement. And that's been an effort that is required, I think, as the Court can imagine, a substantial amount of work on the part of the department. And then second, I don't think there's any dispute about the consequences of enforcing the January deadline in this case by the department's calculations that would involve sending more than $11 billion in refunds and discharges to the post-class applicants. And so is that accurate, that figure you just said, because my understanding is that you would be discharging loans that are at risk at best, and that's your alleged $11 billion number, and that in actuality, the number of refunds is $640 million? So the top-line number, I think, is certainly accurate when we're talking about $11 billion in discharges and refunds combined. What's the actual amount of discharges that we're talking about here? So it's substantially less than that. The $640, I think, actually overstates it a little bit. The $640 million came from the department's estimates of kind of the entire January tranche. It is true, is it not, that you would not necessarily – the government would not necessarily be paid the full amount of the loans. In fact, these are very risky loans because of the nature of the schools that they attended. And many of them didn't get the employment that they thought they were going to be getting. So these are very at-risk loans. Yes, look, I don't know, at the end of the day, if all of these loans were not discharged, sort of how much money the department would ultimately be able to collect from these borrowers. But I think we're all in agreement that the $11 billion is the number. Just to jump in real quick. I mean, if you were going to try to sell these loans on the open market, you would not get $1, $11 billion. You might get 20% to 30%. I don't know. I mean, I think that – I understand there's a technical number of $11 billion, but when you come out and say it's $11 billion, it's like $11 billion in coupons. It's not $11 billion in real money, and that's one of the things I think we have to assess when we're trying to see if the judges abuse their discretion or not. So I think you have to give us a little leeway here on the number. I appreciate the technical number is $11 billion. I don't think anyone in the private equity market would buy these loans for $11 billion. Is that fair? Yes, I don't think we're disputing that. I mean, I think you're talking about hundreds of millions in refunds, which is cash out the door. And then on the discharges, I mean even if it's 20% of $11 billion, that's a lot of money for the government. It is. What was the government's plan before it got the money, the funding, the big bill? Was the plan to just simply not process these and to automatically give people relief? I think the day before we got the money from Congress, there was no way the department was going to be able to meet its obligations. I think at that point, because it didn't have the resources to develop a plan to ask for a reasonable extension, it was willing to take the medicine provided for in the settlement. I think once the department got the money from Congress, that significantly changed things for the department because it allowed the department to develop the plan to hire hundreds of people. Why did the two district courts abuse their discretion given just the fact that the government was aware for the whole period really that there was going to be about 200-plus people in this post-class group? Yes, so I think there's two sort of fundamental errors in the district court's opinion that they would establish the abuse of discretion that the court might be looking for. Number one, I think the district court says three separate times in the December opinion in the oral ruling that the district court believed that the department actually could meet the deadline and could adjudicate 170,000 applications in the six weeks remaining before the deadline. Counsel, but isn't that because, as Judge Alsup said, you, I don't know if you personally, but someone in the government kept saying we're on track, we're on the way, we're going to get it done. And so that's why district court Judge Alsup believed that you could get it done because you were, counsel was telling him all along it would be getting done. So I think there's two things, Your Honor. I mean, number one, I think if you actually look at the statements that he references, they are really not saying that we're going to adjudicate the applications. They're saying we're aware of our obligations. And as I said to Judge Bress, I think before the department got the money from Congress, it just knew that there was no way it was going to meet the deadline. Why didn't the department then go and alert Judge Alsup if they knew they weren't going to get it done? Why didn't they go in earlier and say, Judge Alsup, we cannot do this, instead of waiting until December? I'm sorry, I think at the rate that the department was processing applications before it got the infusion of additional money from Congress, it would have taken somewhere between 10 and 15 years to complete the applications. And I think the department reasonably understood that it would have been a waste of everyone's time to go back to the plaintiffs or the district court and ask for a 10-year extension or a 15-year extension to allow it to complete the applications. Instead, I think once the department got the money, that was what allowed it to develop the much more reasonable request for an 18-month extension rather than sort of 10 years or 15 years. What is entailed in processing, especially the Exhibit C group, because I understand that's the biggest percentage of these post-class members, but the Exhibit C schools seem to be – there's a more established record as to the issues with them. So why would it take – what's involved in processing those applications? I think it's extremely intensive, Your Honor. And let me say a few things about it. Number one is the Exhibit C folks who were actually part of the class got automatic relief. And the upshot of that was that when the department was processing those applications, it wasn't developing the factual record that it would need to develop now because it wasn't – Counsel, I think you have a misstatement in there because isn't it true that both Judge Alsop – well, it's a term, a settlement agreement, that the post-class, which is a misnomer, people are part of the class? So I think – and this is a very important point – I think that is just flatly incorrect. I will point the court to the settlement agreement itself, which we have in our appendix. And if you look at – sorry. One second. If you look at appendix 156, what the settlement agreement says is the class is closed as of the execution date. The post-class applicants are people who submitted their applications after the execution date. They are absolutely carved out. How does it say the class is closed? Because I'm looking at the settlement agreement. I guess it's bait-stamped at 161. It's section D – I don't know what. It says, if an individual submits a borrowed defense application after the execution date, i.e., the date the class closes, but before the final approval date, such individual is a post-class applicant. Defendants will issue a final decision on the merits no later than 36 months after the effective date. In making these decisions, it goes on. And so both Judges Elsup and Judge Gilliam made a finding of fact that, in fact, the post-class applicants were going to be paid the same as the class and that they're part of the class. That's in both of their decisions. Yes. I'll say, number one, I don't think it's a finding of fact at all. I think that's a legal conclusion. It's just not well-founded. I think, again, if you look at the settlement, and you can ask plans about this, I think plans would tell you the clear intent of the settlement is to carve the post-class applicants out of the class, to close the class, as the settlement says. I guess the bigger question to me, though, is what is the relevance of this point for what you're asking for? So, I mean, you claim they're not part of the class, but nonetheless, the government does intend to process their applications and to pay the ones who are deserving. And so why does this distinction matter if they're part of the class, just in terms of where we are today? Yeah, so I think the distinction is extremely relevant, and it's because, under the principles articulated by the Supreme Court in CASA, when the district court or when this court is exercising equitable authority in determining whether the equities support applying the deadline as in the agreement without the modification, the preeminent worry for the court has to be the interest of the parties to the case. And the parties to this case are the group one and two applicants, the members of the class that the government, I think, has really done a remarkable job of getting relief out to. I mean, if you were here arguing that these post-class people just should not be entitled to anything whatsoever, I would – then I would understand there's a huge issue as to whether they're entitled to any relief at all. But aren't we at the point now where your clients agree to give them relief? We certainly agree to give them relief, Your Honor, and I think that's absolutely true. And the government can agree in a settlement to give relief to sort of third-party beneficiaries, which I think is what the government did here. But then when doing the Rule 60B analysis, the relevant question is whether the equities support prospectively applying the judgment, which in this case includes the settlement as incorporated into the judgment. And in doing that equitable analysis – and I don't think plaintiffs really dispute this – in doing that equitable analysis, the court has to be guided by CASA, which means that to the extent that the post-class applicants are not actually plaintiffs, then their interests just don't carry the same weight in the equitable analysis. And that, to get back to sort of the earlier answer, I think is the second fundamental problem with Judge Alsup's original decision in December. It is he gave the interest of the post-class applicants full weight in the equitable balancing, even though they are, I think, plainly carved out of the plaintiff class. Counsel, just to go back to basics while you're still here, what exactly are you asking us to stay? We are asking the court primarily to stay the January 28, 2026 deadline contained in the settlement agreement and incorporated into the final judgment for adjudicating the post-class applications. And now how can we stay that? Because that is, in effect, modifying a term in the original settlement agreement. Correct, John. So the settlement agreement is incorporated into the final judgment. The district court retained jurisdiction over the settlement agreement. And so this court and the Supreme Court have a number of cases. Some of them we cite in our briefs. Kelly against Wengler is one that we cite. Horn from the Supreme Court. When a district court incorporates a settlement into a final judgment, the settlement is treated sort of as part of a court order and subject to sort of modification and enforcement, just like a court order is. And so to stop there. So is the government currently in contempt of the district court's order? No, Your Honor. I mean, there's actually two things. Number one is that the settlement says that if we don't meet the deadline, we then have to provide notice within 60 days and then relief a year after that. And so the notice deadline is coming up. So what is the emergency? Yes. So the emergency, Your Honor, as we explained in the motion, is that the notice deadline, which starts the clock on having to provide full relief to the non parties is March 30th. And so notice, but the real deadline is a year after that. Correct. But as we explained in our motion to process relief for 200,000 applications, which I think cover something like a million loans, it's going to take the department the entire year. And so the department soon after sending the notice is going to have to start sending out the discharges and refunds if it doesn't receive relief under the settlement agreement. After you provide the March notice, are you. After you provide a notice, are you essentially bound to the payment or to the relief, or can there still be adjudications after March? So I think under the terms of the settlement without modification, we once we missed the January deadline, we are required to provide full relief. That's why we need relief from the court. So even if we were to do adjudications in the meantime and find that they were not meritorious applications, we would still be required to provide to provide relief. And then, as I said, I just as a practical matter, once the 1 year clock starts ticking, the department needs to start processing the relief and sending it out the door. If we were to ultimately win on appeal, not having received emergency relief in the meantime, I don't know whether we would be in a position to try to claw back relief. We've already given. I think that would be a pretty tricky thing to do. And so that's why we're asking for relief on the front end to stop the clock from the government is processing these applications. What are reasons why they're denied? You know, I think the government would have a lot of different reasons. I mean, some may be that there's no misrepresentation. Either on the face of the application, or that the evidence developed by the department doesn't support the idea or the conclusion that the particular school engaged in misrepresentation. You know, there may also be not just denials, but sort of partial relief if the department determines that an applicant is not entitled to kind of a full refund and discharge that sort of maybe a sort of partial denial partial grant. But I think it would depend on the particular application. There are no further questions I see I've used all of my time. So I'll give you some time to for rebuttal.  Okay. Miss Ellis. Miss Ellis. Yes, it is. Yes. Thank you, Your Honor. And may it please the court. I'm Rebecca Ellis from the project on predatory student lending, representing the plaintiff appellees. I'd like to pick up with the question of what exactly the government is asking for in relief here. And as my colleague explained what they're looking for is a stay of the January 28 2026 decision deadline. So to begin with, the date has passed. It's not clear how they can ask for a stay of something that has already happened. But moreover, this is a motion for a stay pending appeal. The appeal here is of the district courts December 11 2025 and February 24 2026 orders. It is not and it cannot be an appeal of the final judgment in this case that incorporated the party settlement agreement because that judgment is more than three years old. The deadline for appealing it passed on January 28 2023. The department did not appeal the judgment at the time. They knew at that time how many post-class applicants there were, but they did not appeal the judgment. They did not appeal judge. The judgment was that is the settlements essentially put into the judgment. Yes, your honor. Okay. Yes, the settlement is incorporated into the final judgment and the department did not object or appeal at that time to judge. One of those intervenors raised the exact argument that the government is raising today that post-class applicants are not class members judge also considered that argument decided it was incorrect held that post-class members are members of the class. So and the government has treated post-class members as such ever since they've reported data to us on the post-class. They've issued decisions under the settlement. And so it is very hard to see how it could possibly have been an abuse of discretion for judge also and judge Gilliam to consider the equities involved for the post-class members here and to stick to that law of the case that they are class members. Now regardless of you know, whether you turn them class members or not, I think your honors correctly recognized that the government owes certain responsibilities to post-class members under the settlement. That's not in question. They must provide decisions by a certain date that date at least for post-class exhibit see members under judge else. Absorber was January 28th, 2026. The government did not appeal the December 11th order after it issued. They did not seek a stay in the district court or any other sort of temporary or emergency relief after that order. The government conceded in allowing the January 28th deadline to pass and the settlement and judge else absorber were in full force and effect on that date. So as a result, as of today, post-class exhibit see members who did not receive a decision by January 28th have a binding contractual right to full settlement relief. What the government is asking the court to do here today is really quite extraordinary in that they're asking to for this court on an emergency basis, not even on a fully developed record to rewrite the party settlement agreement to say you make of the government's argument that there are people who are filing applications who shouldn't actually receive relief. If we were to go through and properly adjudicate them. Well, your honor, I would say that the government had three years to adjudicate those applications. And furthermore, there actually is a provision in the settlement agreement that would have allowed them to try to change the post-class deadline. And I would point the court to the to the government's appendix. It's paragraph 5D5 of the settlement and that is on page. Sorry, let me just scroll to it. That is on page 169 to 170 of the settlement agreement and this paragraph says if defendants are reasonably prevented from or delayed and fully performing any of the obligations set forth in paragraph four above, which includes post-class decisions. Due to extraordinary circumstances beyond defendants control, defendants will notify plaintiffs counsel within 14 calendar days of defendants determination that they will not be able to fully perform their obligations. And then the paragraph goes on to describe a meet and confer process. And if the meet and confer fails, then it provides that. The plaintiffs can raise a claim of anticipatory breach, which the defendants can then oppose on the grounds of extraordinary circumstances and the court can at that point determine whether defendants are entitled to an extension of the deadline. So at any time from final approval through November 2025 when they filed their Rule 60B motion, the defendants could have invoked this provision. They could have approached the plaintiffs and said we don't have enough money. We don't believe we're going to be able to meet this deadline. We need an extension. But they never did. And instead they did repeatedly say we understand the deadline. We know the deadline is coming. How about after the time period after the big bill was enacted? No, Your Honor. They still did not invoke this provision after the big bill was enacted. And in fact, in their first 60B motion before Judge Alsop, the defendants included a footnote in their brief essentially saying we don't think we have to follow this provision. We have an independent right to 60B relief, so we're not going to do the contractual remedy that's available to us. Why is that? Because the contractual remedy expired by that point? No, the contractual remedy absolutely was available. They just didn't want to do it. You can ask my colleague what his view is on why they didn't do it, but it was absolutely available to them at the time. So is it still available to them now then? Well, now the deadline has passed, so I would say they would not be able to seek a delay of the deadline that has already passed. There is still one more deadline left, which is April 15th, a deadline to make decisions on post-class non-Exhibit C applications. I suppose this paragraph would still apply if the government wanted to approach us about an inability to meet that deadline. So what's the number of Exhibit C debtors versus non-Exhibit C debtors of the remaining loans? Roughly, it's 170,000 Exhibit C people and 20,000 non-Exhibit C. Those are estimates, but it's in that ballpark. Okay, so of the $11 billion number that's being talked about here, how much money are we talking about in discharges? Well, Your Honor, if we assumed that the debt load is roughly equally distributed across members of the post-class, you'd be looking at around mental math, right? I don't know the exact percentages. It would be roughly the proportion. I understand. Obviously, this is an emergency motion, so I'm not going to completely understand every aspect of this case. But I do understand that the Exhibit C debtors are for schools that essentially state attorney generals have already found that these schools made misrepresentations. So I don't know what's left for the government to do before discharging those loans. I think that's right, Your Honor. These are schools that the government agreed in the course of the settlement have substantial indicia of widespread misconduct. And in fact, we know that there are about 30,000 out of those 170,000 whose schools engaged in such widespread misconduct that the department has separately, outside of these suite proceedings, has separately said all loans from those schools will be canceled, at least within certain defined periods of time. The government says, well, there's still work to do to evaluate. What do you make of that? What does the record show on that? Your Honor, I think the record shows that there is significant common evidence for these Exhibit C schools. And so all that would be left to do in our view, or all that was left to do before the deadline, was for the government to see whether those applications described misconduct of a type that we know occurred. So, for instance, for many schools, there's widespread evidence that they misrepresented their job placement rates. They would say 90% of our graduates get a job. It turns out only 30% of their graduates got a job. So then if someone submitted an application and said, this school lied to me about job placement rates, in our view, there's not much left to do. So that's stating a borrower defense to repayment that is supported by significant evidence that already exists. Now, I'm certainly not saying you can't approve a borrower defense application unless you have this widespread evidence. But for Exhibit C schools, that evidence does exist. The department has it. That's why they agreed to Exhibit C in the settlement in the first place. How many schools in Exhibit C still exist? I know there's been some bankruptcies. I don't have an exact number for you. There's a significant number of Exhibit C schools that are closed. Either they went bankrupt, or they closed not in bankruptcy, or they split programs off for parts. I don't have an exact percentage for you, but it is a significant number of those schools that no longer exist. And many of the largest schools no longer exist. We have large numbers of applicants, for instance, from ITT Technical Institute that went bankrupt in 2016. I do want to address the issue, going back to Judge Wardlaw's question about the amount of the discharges. We did submit evidence and argument below about why we believe that this amount is inflated. That would be at pages 73 to 78 of Plaintiff's Supplemental Appendix, including a GAO report, which states that the Education Department can actually expect to lose $9 for every $100 of student loans dispersed. So what we're talking about here is not really $11 billion. What we're talking about is some much smaller percentage of $11 billion that will be potentially collected over perhaps the next 30 years. We already know that at least those 30,000 people from the schools that have received group discharges are going to get their loans discharged in any event. There are certainly many more people in that group who are going to qualify for public service loan forgiveness, who are going to pay for 20 years and then get an income-driven repayment discharge, who already have total and permanent disabilities. I mean, the number is not accurate. We do not agree that the number is accurate. But also, we do not agree that the number is relevant. The government agreed to this settlement three years ago. It is fair to hold them to their word. In assessing the equities, can you please describe the harms to the people whose loans have not been discharged? Absolutely, Your Honor. So the government states that those people's loans can remain in forbearance. That is generally true, although due to various issues with loan servicers, it is not always true. But even for the people whose loans are in forbearance, these loans have absolutely wrecked their credit. And you'll see in the evidence that we put in below, which is in our supplemental appendix, we have class members who have lost their cars, they've lost their housing, they have illnesses that they have trouble paying for. And even beyond the effect on their credit, it has an effect on people's mental and emotional well-being. This case has always been about the government's unreasonable delay in dealing with these applications. The people in the post-class applied in 2022. They've already been waiting for a decision for almost four years. And they had this date on their calendar. You know, they thought, even if I get denied, at least it will be over by January 28, 2026. And to have that rug pulled out from under them is gravely injurious to the class. I see that my time is up, so if there are no further questions, I'll step back. All right, Mr. Is it Janda? Janda, Your Honor. Mr. Janda, I'll give you a minute to respond to anything you think needs responding to. Great, thank you. I mean, just very briefly, number one, on the question of whether we should have used the contractual remedy provision, I will point the court to Appendix 53. Originally, plaintiffs moved to strike our motion saying we should have gone through the contractual remedy provision on Appendix 53. They withdrew that motion, I think, for the quite practical reason that it doesn't make any sense to sort of forestall adjudicating effectively this question about whether we're entitled to an extension another two months or a year or whatever it's going to take to go through that process. Number two, just in terms of the last three years. Hold on a second. You're moving quickly. You don't have to talk that quickly. Going back to that, I just want to make sure I understand. There's a contractual provision that Ms. Ellis pointed to and the government didn't invoke it. Why? Your Honor, we did not believe that the contractual provision precluded seeking Rule 60 relief because, as I said. But that doesn't mean you couldn't have sought relief under the contract? You just chose not to? I think we could have sought relief under the contract, although I think the primary difference is there would have been a long meeting for process. And then we've been kind of an anticipatory motion from plaintiffs that we would have then responded to. I think it would have been effectively the same issues the court would have been adjudicating, which is why plaintiffs withdrew their objection to the way that we went about the process. Again, in Appendix 53, I think we just wanted determination from the court about whether we have to send this relief out or whether we can move forward with the plan of adjudicating these applications over the next year and a half. If you had done what you agreed to do, which is provide 14 days notice, we wouldn't be here right now, would we? I think we would, Your Honor. We might be in a place where the district court judge gave you an extension because you could show the government was acting reasonably and as quickly as it could or whatever. But that was a way that you could have worked it out and modified your agreement without filing sort of a motion where you have to show that there's some sort of extraordinary circumstances beyond your control to get relief. I don't think that's right, Your Honor. I think the contractual provision requires effectively the same showing, and I would be stunned to learn that plaintiffs would tell you that they would have agreed to a modification if we had gone to them instead of filing the Rule 60 motion. I think that's why they withdrew their motion to strike at the hearing. I think they understood that there's really no practical difference between proceeding through the contractual provision and proceeding through Rule 60B. The ultimate question is whether the equities support extending or modifying this deadline. Do you agree that would have been a way where you would end up in front of the district court judge in a way where you could effectively renegotiate your settlement agreement, whereas now you just let the deadlines pass and you can't renegotiate now. District Court did grant you some relief with respect to some part of the post-class, but now the time for negotiating is over. You missed your deadline. Again, Your Honor, I don't think that would have been productive in any way. I think it's pretty clear what the plaintiff's view and the district court's view would have been. It's really the same question. Again, if the district court denies that, we may well just have been here and I think it would have been effectively the exact same arguments we would be making here. The other thing I would say very briefly, if I may, is in terms of what the department's been doing for the last three years, I think it's important to understand that as soon as the department realized that this group of applications was many times larger than it thought it would be. When you did that three years ago, you knew the number was 205,000, right? Correct. In the department's next budget request in 2023, it went to Congress and tried to get more money. I mean, again, I think it's pretty hard for plaintiffs to complain that we tried to solve the problem that way, rather than trying to solve the problem by getting out of the agreement three years ago. I mean, I think the department was trying to do everything it could to get the resources it needed to solve this problem, and it took three budget cycles for Congress to finally give the department the additional money in July after rejecting request choice. But I don't know that it would be better for anyone if the department had tried to get out of the settlement three and a half years ago, rather than trying to get the money from Congress to allow it to adjudicate the claims. Again, it turns out not by the deadline, but I think with a quite reasonable extension of the deadline. All right. Thank you, counsel. Thank you. There are no further questions. Okay. Sweet versus McMahon will be submitted in this session of the court is adjourned for today. This court for this session stands adjourned.
judges: WARDLAW, OWENS, BRESS